IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| GRETA A. JAY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 2:09CV136-SRW |
| | ) (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OF OPINION**

Plaintiff Greta Jay brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff completed the eleventh grade in 1996 and has past relevant work as a retail cashier and waitress. (R. 58, 139, 142, 150-57).[1] On June 27, 2006, when she was twenty-seven years old, plaintiff filed applications for disability insurance benefits and supplemental

---

[1] Plaintiff later obtained a GED. (R. 31).

security income, alleging disability since April 15, 1999[2] on the basis of "bipolar disorder, anxiety disorder, borderline disorder." (R. 138, 163). She asserted that, because of these impairments, she is unable to handle "high stress" or to "get along with anybody." (R. 138). On July 18, 2008, after the claim was denied at the initial administrative level, an ALJ conducted an administrative hearing. At the hearing, plaintiff testified as follows:

    She attended a boarding school in Vicksburg, Mississippi, but left four weeks before graduation due to her pregnancy. She was "okay with the teachers" while she was in high school but later had problems with authority. She later obtained a GED and an associate's degree in "applied technology." She has a driver's license and is able to drive. She watches television and reads the Bible, is able to write a letter, and knows how to handle money and pay bills. She cooks, does laundry, and shops for groceries. She attends church three times a week, on Wednesday, Sunday morning and Sunday evening. She has friends at church, but does not see them except at church. She has twin sons, eight years old, and a daughter who is "nearly five." The children do not reside with her. She originally lost custody of her children in 2004 when she "had a psychotic break and . . . abused one of them," biting him on his back. She got the children back after three months but, after a year, her children were again taken from her custody and her parental rights were terminated. She quit her cashier job at Hobo Pantry in 2005, after three months, because she had arguments with other

---

[2] Plaintiff's date last insured is March 31, 2001. (R. 163). Plaintiff previously filed applications for disability insurance benefits and supplemental security income on November 14, 2005. The applications were denied in January and/or February 2006. (R. 75 -76, 79-83, 103-117, 134).

employees. She earlier quit her job as a waitress/cashier at Pizza Hut "because of the pressure and the stress and . . . [t]hey had cut the hours low." She explained that "a lot of the reason" she left was because of the hours, but that she also "would get really stressed out" due to job pressure and got into arguments with people "all the time." After her Hobo Pantry job, she worked in the deli department of an IGA for a week. She was fired after she was "talking loud" to a customer and her employer thought that she was "screaming" at the customer. She lives in a trailer which her father purchased for her, and he pays for her utilities. Her father also pays for her car and gasoline. She went to Alabama State Vocational Rehabilitation once "years ago" and does not know why she did not go back. She has not looked for work because her medication causes her to have "no energy," she gets bad headaches "a lot of times," and she has to go to appointments with her doctor and mental health. She goes to the mental health center about twice a month for thirty minutes to an hour.

Plaintiff first sought mental health treatment from South Central Mental Health Center on April 22, 2004, for complaints of depression. The intake counselor diagnosed adjustment disorder with mild anxiety and depressed mood and personality disorder, and assessed her GAF score as "71." (R. 201-08). She returned to the Center on June 2, 2004, a week and a half after DHR took custody of her children. She reported that "[i]t got severe when they took my kids away" so her family physician had prescribed Wellbutrin a week earlier. The psychiatrist diagnosed generalized anxiety disorder, adjustment disorder, and narcissistic traits, continued plaintiff on Wellbutrin and added a prescription for Vistaril, and prescribed therapy. (R. 214-17).

Coffee County DHR referred plaintiff to Allen Freet, a licensed counselor, for assessment. On June 30, 2004, Freet administered the Beck Anxiety Inventory, the Beck Depression Inventory - Second Edition, and the Minnesota Multiphasic Personality Inventory-2. He also interviewed the plaintiff. Freet gave an Axis I diagnosis of "Rule out Bipolar Disorder," Axis II diagnoses of borderline personality disorder with paranoid ideations, antisocial personality disorder, and "rule out" narcissistic Personality Disorder. On Axis V, he assessed her current GAF at "60." (Exhibit 2F).

In July 2004, plaintiff's progress at South Central Mental Health Center was recorded as "adequate." Her plan was to be extended if she returned for treatment. (R. 210). However, plaintiff's treatment plan at the Center was inactivated on September 3, 2004, due to her noncompliance. (R. 200, 210, 290). On September 9, 2004; November 15, 2004; May 5, 2005; and July 13, 2005, plaintiff was treated by Dr. Shakir Meghani of Southeast Psychiatric Services with medication. In her July office visit, plaintiff reported that she had again lost custody of her children because she spanked them. (Exhibit 1F).

On November 21, 2005, plaintiff returned to South Central Mental Health, requesting mental health services for the treatment of bipolar disorder and stating that she would like to regain custody of her children. She was scheduled for an evaluation with a counselor on December 15, 2005. (R. 183-86). At the evaluation, she reported that she lost custody of her children because she "whipped the boys after they misbehaved in day care." The counselor noted that "[s]he takes little or no responsibility for any actions she may have taken to lead up to the removal." Plaintiff stated that she has bipolar disorder and "needs to 'get back on [her] medication and get [her] kids back.'" (R. 195). She was diagnosed with bipolar disorder

and personality disorder, and her current GAF score was assessed at "70." (R. 196). Plaintiff continued her treatment with South Central Alabama Mental Health Center, seeing the staff psychiatrist three times for evaluation and medication. On June 27, 2006, plaintiff filed her applications for disability benefits and supplemental security income. On July 17, 2006, she told the psychiatrist that she was not able to gain custody of her children due to her diagnoses and that she required intensive treatment with Dr. Meghani's group. (R. 199, 212-14, 290). At that visit, the psychiatrist started plaintiff on Lithium. (R. 213).

On September 2, 2006, plaintiff reported to W.G. Brantley, Ph.D., for a consultative mental status examination. She reported that she "used to go to Andalusia Mental Health and now goes to a private provider and sees a counselor by the name of Terry Bradshaw." (R. 219). Plaintiff reported to Dr. Brantley that she was "a lot more stabilized" on her Lithium, and that she had asked for the Lithium level to be reduced to avoid sedation and side effects. (R. 220). She stated that she is "interested in working, but does not want it to interfere with receiving Disability benefits." Dr. Brantley noted that plaintiff believed herself to be "able to work . . . to some degree," but that "[s]he does want the security of Disability benefits." (R. 221). Plaintiff told Dr. Brantley that she "spends the day visiting friends, socializing, and writing poetry." (Id.). Dr. Brantley concurred in the Mental Health Center's diagnoses of "Bipolar Disorder, NOS, in Partial Remission (296.89) With No Psychotic Features" and "Personality Disorder, NOS (301.9)" and noted that she is "[m]oderately stable in regard to Bipolar Disorder." (Id.).

On September 20, 2006, plaintiff was evaluated by Dr. Josue Becerra at Enterprise

5

Behavioral Health Services. She was there because her counselor had sent her there, she thought, for "medication issues." She reported "approx[imately] three years of emotional difficulties and 'stress.'" Dr. Becerra noted that she was "flirtatious," well-groomed and fully oriented, with normal motor activity, appropriate affect, normal mood, good attention span, normal speech, good insight and judgment, and with no psychosis or indication of suicidal or homicidal ideation, plan or attempts. He diagnosed a "[history of Bipolar Disorder (??)," impulse control disorder and personality disorder, and assessed her GAF score to be 60-70. Dr. Becerra continued her on Lithium, started her on Clonazepam, and discontinued her prescription for Trazodone. (R. 246-48). Plaintiff returned for a scheduled follow-up visit on September 27, 2006, reporting that she felt "calmer." Dr. Becerra noted plaintiff to be "mildly hostile" but otherwise noted no abnormalities. He noted that her progress toward treatment goals was "good." He increased her Lithium prescription due to lab results, and continued her on Clonazepam. He advised her to follow-up with her counselor as needed, and to follow-up at the clinic in two weeks. (R. 245).

Plaintiff's next office visit was on December 14, 2006, when she was seen for follow-up by Dr. Antonio Gracia. Dr. Gracia described her as "alert, very neat, pretty," "verbal" and "jovial." He continued her on Lithium, Klonopin,[3] and Lexapro, and scheduled her for follow up in February. (R. 244).

In March 2007, plaintiff saw Dr. Meghani twice. On March 3, 2007, he noted that her

---

[3] Clonazepam, prescribed by Dr. Becerra, is the generic name for Klonopin. *The Pill Book*, p. 274 (14th ed.)(Silverman, Pharm. D., ed.)

6

mood was "OK" and that she was making "fair" progress toward goals. He noted that her attention span, recent memory and impulse control were "fair" and that she was "fidgety," but otherwise noted no abnormalities as to her mental status. He noted that plaintiff did not like the Klonopin. He changed her prescription from Klonopin to Xanax, increased her dosage of Lexapro, and continued her Lithium. On follow-up on March 31st, Dr. Meghani noted good progress, observed no abnormalities in her current mental status, continued her medication at the same dosages, and advised her to follow up in ninety days. (R. 242-43).[4]

On July 30, 2007, plaintiff reported that she was going to church and that it had made a change in her life. Her chief complaint was that she was gaining weight. Dr. Meghani noted that her mood was "OK," her affect "appropriate," "labile," and "hyperthymic," her attention span and impulse control were "fair," that she was hyperactive and fidgety, and that her progress toward treatment goals was fair to good. He continued her medications at the same dosages. (R. 241). The record includes no further treatment records from Dr. Meghani or any other psychiatrist in his clinic.

On November 19, 2007, Dr. Meghani completed a form estimating that the degree of impairment of plaintiff's "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was "marked" to "extreme." He

---

[4] Three weeks earlier, on March 7, 2007, plaintiff's counselor completed a form indicating that plaintiff had "extreme" impairment of her abilities to get along with coworkers or peers, to make simple work-related decisions, and to respond appropriately to work pressures and supervision. She noted marked impairment of plaintiff's abilities in several other areas. (R. 237-239). The record includes no treatment notes from plaintiff's counselor.

indicated "marked" impairments in eleven of the other rated abilities, and "moderate" impairment in the remaining six abilities. (R. 252).

On April 21, 2008, plaintiff sought treatment at the emergency room of Crenshaw Community Hospital. She reported "feeling sad, anxious, and depressed" with symptoms of sleep and appetite disturbance, feeling like crying most of the time, low energy level, and lost pleasure in all activities, and feeling hopeless and helpless. She admitted to thoughts of suicide, but denied any plans to harm herself. She reported mood swings, but no full manic or hypomanic episode. She stated that she was "out of medicines and all messed up." (R. 255). Her drug screen revealed Methadone, but she denied taking it. Her mood was depressed, irritable and unstable, her affect was flattened, she revealed some mood delusional features, her memory was fair to poor, and her impulse control, judgement/insight, and reality testing were diminished. Her GAF score was assessed at "18." She was admitted to the hospital with suicide precautions and was treated with psychotherapy and medication. (Exhibit 10F). Dr. Smith, the psychiatrist, discharged her on April 29, 2008, noting that:

> The patient's condition improved; was eating and sleeping in a normal fashion; no longer felt helpless and hopeless; denied current suicidal or assaultive ideation; was free of delusions or hallucinations. The patient denied adverse side effects to medications. The patient was fully informed of the risks versus benefits of all medication and allowed to ask questions. All questions were answered, the patient fully understood and, being informed requested we continue such medication.

(R. 257). Her GAF score upon discharge was "70" or "80," she was noted to be "medically and psychiatrically stable" and she was discharged home on medications – Valproic Acid, Trazodone, and Cogentin – and with a plan to follow-up with Mr. Underwood at South

8

Central Alabama Mental Health Center the following day. (R. 259-60, 291-94). After an initial intake appointment with Underwood on May 20, 2008, plaintiff's treatment plan was to include a monthly meeting with a therapist, and an assessment by the psychiatrist once every six months. (R. 285). Plaintiff's admitting diagnosis by the psychologist at South Central Alabama Mental Health Center included a GAF score of 41. (R. 299).

The ALJ rendered a decision on August 14, 2008. The ALJ concluded that plaintiff suffered from the severe impairments of bipolar disorder and personality disorder. (R. 17). He found that plaintiff's impairments, considered in combination, did not meet or equal the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform medium work, except involving work with the public, and working with objects rather than people. He determined that there are a significant number of such jobs in the national economy – including hand packager, kitchen worker, and janitor custodian – and, accordingly, he concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On January 7, 2009, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v.

9

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, raising two issues: (1) that the ALJ "failed to evaluate the medical opinions expressed by Ms. Jay's treating psychiatrist [Dr. Meghani] under proper legal standard[;]" and (2) "the ALJ did not give proper consideration to the effect of the combinations of Ms. Jay's impairments on her ability to perform work activities." (Plaintiff's brief, p. 9).

### Combination of Impairments

As plaintiff argues, the ALJ is required to consider plaintiff's impairments in combination. The ALJ found that plaintiff suffered from two "severe" mental impairments – bipolar disorder and personality disorder. Plaintiff points to the ALJ's "conclusory

statements regarding [the 'paragraph B'] criteria"[5] when he assessed them (see R. 17-18), and contends that the ALJ's analysis demonstrates that he failed to consider the limitations imposed by plaintiff's personality disorder.[6]  (Plaintiff's brief, p. 12). However, plaintiff has been diagnosed on various occasions with bipolar disorder in conjunction with a diagnosis of personality disorder (see *e.g.,* R. 182, 196, 221, 248), and the ALJ discussed these medical records in his decision (R. 20, 22).  Additionally, in reaching his determination in the present case, the ALJ stated that "[t]he claimant does not have an impairment *or combination of impairments* that meets or medically equals one of the [listings]." (R. 17)(emphasis added). In Wilson v. Barnhart, 284 F.3d 1219, 1224-25 (11th Cir. 2002), the Eleventh Circuit rejected the district court's determination that the ALJ had not discussed "the cumulative effects of Plaintiff's impairments" where the ALJ had made a statement nearly identical to that made in the present case. The court noted that the referenced statement "constitutes evidence that [the ALJ] considered the combined effects of [plaintiff's] impairments." Id. at 1224. The Eleventh Circuit relied on Jones v. Department of Health and Human Services, 941 F.2d 1529 (11th Cir. 1991), in which the court had previously determined that the language of the ALJ's step three finding that the claimant did not have "an impairment or combination of impairments" which met or equaled the listings evidenced consideration of the combined effect of plaintiff's impairments.  Wilson, 284 F.3d at 1225 (citing Jones, 941

---

[5] The "paragraph B" criteria include: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. See 20 C.F.R. Part 404, Subpt. P., App. 1, § 12.00 *et seq.*, Mental Disorders.

[6] Plaintiff does not allege disability on the basis of any physical impairment.

11

F.2d at 1533). In the present case, the ALJ's step three finding that the plaintiff does not have a "combination of impairments" that meets or equals the listing is sufficient, under Eleventh Circuit law, to evidence the ALJ's consideration of the combined effect of plaintiff's impairments. Accordingly, plaintiff's argument that the ALJ did not give proper consideration to the effect of the combination of plaintiff's impairments on her ability to perform work activities is without merit.

## Treating Psychiatrist's Opinion

Plaintiff argues that the ALJ failed to evaluate Dr. Meghani's opinion "that she had mostly marked or extreme limitations" under the proper legal standard (Plaintiff's brief, p. 9). "If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the

12

ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

In his decision, the ALJ wrote:

Less weight is given to Dr. Meghani who opined that the claimant had mostly marked or extreme limitations. However, these limitations are not consistent with medical evidence as a whole as shown above.

(R. 23). Immediately before this language, the ALJ set forth the specific reasons for his conclusion that the limitations were "not consistent with the medical evidence as a whole." He noted that the totality of the medical evidence indicates that, when plaintiff is taking her medication, her GAF scores are 60 to 70, indicating mild to moderate symptoms. (R. 22).[7] The ALJ specifically cited the evidence of plaintiff's hospital admission and condition upon discharge, the results of her consultative evaluations with Freet and Brantley (including plaintiff's statement to Brantley that she was interested in working but did not want a job to interfere with receiving disability benefits), and records from Enterprise Behavioral Health – Dr. Meghani's practice – which were inconsistent with the marked and extreme limitations. (R. 22-23).

---

[7] A score of 51-60 on the Global Assessment of Functioning (GAF) scale, indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-R, p. 34. A score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

13

The reasons articulated by the ALJ for discounting Dr. Meghani's opinion are supported by substantial evidence. Plaintiff was first treated by Dr. Meghani, including prescribed medications, for a ten-month period ending in July 2005. (Exhibit 1F). She did not again seek mental health treatment until over four months later, when she returned to South Central Alabama Mental Health. (Exhibit 3F). In her intake evaluation in December 2005, she told the counselor that she has bipolar disorder and "needs to 'get back on [her] medication and get [her] kids back.'" (R. 195). Over the next several months, plaintiff received treatment and medication from South Central Alabama Mental Health providers, including a prescription for Lithium. (Exhibit 3F, R. 213). In early September 2006, plaintiff reported to Dr. Brantley that she was "a lot more stabilized" on her Lithium, and that she had even asked for the Lithium level to be reduced to avoid sedation and side effects. She stated that she is "interested in working, but does not want it to interfere with receiving Disability benefits." (R. 220-21). Later that same month, when plaintiff was evaluated by Dr. Becerra of Enterprise Behavioral Health – Dr. Meghani's practice – Dr. Becerra recorded observations that plaintiff was well-groomed, fully oriented, had normal motor activity, appropriate affect, normal mood, no psychosis, good attention span, normal speech and good insight/judgment. He assessed her GAF at 60-70, and continued her on Lithium. (Exhibit 8F, R. 247-48). At a follow-up a week later, he noted no abnormal observations, except that she was "mildly" hostile, and plaintiff reported feeling calmer. (R. 245). Dr. Gracia, at follow-up appointment three months later, again continued plaintiff's prescriptions, observing that she was "alert, very neat, pretty . . . verbal . . . [and] jovial." (R. 244). At

14

plaintiff's next three-month follow-up, on March 3, 2007, Dr. Meghani noted that plaintiff was "fidgety," but her attention span, memory and impulse control were "fair," her mood and orientation "OK", her affect appropriate and her behavior normal. (R. 243). Four weeks later, Dr. Meghani's observations showed improvement, with normal motor activity and good attention span, memory and impulse control. Her orientation and mood remained "OK," and she was "fully alert" with "normal" behavior, "goal directed" thought process, no hallucinations, no evidence of suicidal or homicidal ideation or threats, and "average" judgment/insight. He continued her medications at the current dosages. (R. 242). At plaintiff's final follow-up appointment of record with Enterprise Behavioral Health, on July 30, 2007, plaintiff reported that she was attending church and complained primarily about gaining weight. Dr. Meghani noted that her mood was "OK," her affect "appropriate," "labile," and "hyperthymic," her attention span and impulse control were "fair," that she was hyperactive and fidgety, and that her progress toward treatment goals was fair to good. He again continued her medications at the same dosages. (R. 241). When plaintiff presented to the ER at Crenshaw Community Hospital in April 2008, nearly nine months after her last visit to Dr. Meghani, she reported that she was "out of medicines and all messed up." Upon discharge – after inpatient treatment to manage her medication – her GAF was 70. (Exhibit 8F, R. 255-59, hospital discharge summary). The record contains substantial evidentiary support for the ALJ's conclusion that the marked and extreme limitations indicated in Dr. Meghani's form are not consistent with the observations recorded in plaintiff's treatment records at Enterprise Behavioral Health or with other evidence of record.

Plaintiff quotes the ALJ's statement that Dr. Meghani's limitations are not consistent with the medical evidence as a whole, and argues that this reason "triggered [the ALJ's] duty to seek further development of the record before rejecting said opinion." (Plaintiff's brief, p. 10). Plaintiff relies on the Commissioner's regulations, which state that the adjudicator "will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Id. (citing 20 C.F.R. §§ 404.1512(e), 416.912 (e)(1)). Plaintiff then argues that "Dr. Meghani's medical opinions are, in fact, supported by acceptable diagnostic techniques as evidenced by the objective mental status examinations from Southeast Psychiatric Services (Tr. 175-79) and Enterprise Behavioral Health (Tr. 240-50), which support the diagnosis of bipolar disorder and personality disorder." (Plaintiff's brief, p. 10).[8] However, the ALJ accepted both of these diagnoses – bipolar disorder and personality disorder – as severe impairments, and he never indicated that the diagnoses were not supported by medically acceptable diagnostic techniques. Neither did he indicate that Dr. Meghani's opinion form contains a conflict or ambiguity that must be resolved or that it did not contain necessary information. Rather, the ALJ reasoned that the "mostly marked or extreme limitations" indicated by Dr. Meghani on

---

[8] Plaintiff further cites "Mr. Freet's diagnostic impression of antisocial personality disorder and borderline personality disorder[,]" "South Central Alabama Mental Health's diagnostic impression of bipolar disorder[,]" "Dr. Brantley's diagnostic impression of bipolar disorder and mixed personality disorder[,]" and "the medications [Dr. Meghani] chose to administer in the treatment of his patient" as supporting Dr. Meghani's opinion. (Plaintiff's brief, pp. 10-11).

16

the form were not consistent with the medical evidence as a whole. As discussed above, this reason is supported by substantial evidence.

In Couch v. Astrue, 267 Fed. Appx. 853 (11th Cir. 2008), the Eleventh Circuit found no need for additional information or clarification and, accordingly, no duty to recontact the treating physician where the evaluations of consulting psychologists, the plaintiff's reported daily activities and the doctor's own treatment notes supported the ALJ's determination that the plaintiff was not disabled, and where it appeared that the ALJ was in possession of all of the treating physician's records and the information contained in those records was adequate to enable the ALJ to reach his conclusion. Id. at 2. In assessing plaintiff's RFC in the present case, in additional to the medical evidence discussed above, the ALJ also cited evidence of plaintiff's daily activities, including her testimony that she lives independently (except that her father pays for her expenses), attends church three times a week and has no problems at church (R. 19) and her report to Dr. Brantley that she spends the day visiting friends, socializing and writing poetry and that there was no indication of chores not being done due to mental problems (R. 20). There is no indication that plaintiff did not provide the ALJ with all of the records available from Dr. Meghani. The record in this case, like that in Couch, does not reveal an evidentiary gap requiring additional evidence or information from the treating physician. Accordingly, contrary to plaintiff's argument, the ALJ did not have a duty to recontact Dr. Meghani.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the

Commissioner is supported by substantial evidence and proper application of the law. Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

Done, this 7th day of June, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE